Bradley Allen DAY, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2009–SC–000641–DG.

Supreme Court of Kentucky.

Feb. 23, 2012.

Roy Alyette Durham II, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Jeffrey Allan Cross, Criminal Appellate Division, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

## OPINION OF THE COURT

Bradley Day received a three-year sentence following a jury conviction for sexual abuse, first-degree. Day raises four issues on appeal. Because we find the trial court erred by telling the jury the penalty range for the lesser included offense during the guilt phase of trial, we reverse Day's conviction and remand for further proceedings. As such, we will only address the remaining three issues to the extent they are likely to occur in the event of a re-trial.

### Facts

On February 7, 2003, Day took five-year-old R.F. to his home in Augusta, Kentucky. Day and R.F.'s parents were friends. Prior to renting the Augusta house, Day had lived with R.F.'s family. Day helped care for and entertain R.F. and her sibling. In fact, Day taught R.F. to ride a bicycle. Thus, Day taking R.F. with him on an errand was not suspicious.

When R.F. returned from Day's home, she told her mother Day had taken her to his bedroom and asked her to remove her jeans and panties. She said Day kissed her on her legs and vagina. Before taking R.F. to the hospital, the mother changed R.F.'s panties and put new panties on her.

At the hospital, a doctor examined R.F. and a nurse prepared a rape kit.

R.F. and her mother spoke with a Kentucky State Police ("KSP") trooper. Although the trooper collected and bagged the panties R.F. was wearing at the hospital, he told R.F.'s mother to put the jeans and panties R.F. wore to Day's house in a brown paper bag. Upon returning home, the mother did so. However, the trooper did not collect the bag from R.F.'s home for several weeks. Additionally, the trooper did not file a supplemental report re-

garding the second set of panties and the blue jeans.

The trooper spoke with Day about R.F.'s allegations the day after he spoke to R.F. and her mother. Day admitted R.F. came with him to his house and she went in the loft area that was Day's bedroom. However, Day contended while she was there, R.F. only jumped on his bed. He denied abusing her.

The trooper spoke with Day at least two other times during February and March 2003.

In early March 2003, Day quit his job and moved to West Virginia. When a Bracken County Grand Jury returned an indictment against Day for sodomy of R.F., officers arrested Day in West Virginia.

Day went to trial. At trial, the Commonwealth presented testimony from R.F., her mother, and the trooper. The Commonwealth presented evidence of Day's move to West Virginia as "flight evidence." And, the Commonwealth presented expert testimony regarding the scientific testing of the physical evidence in the case. However, the multiple test results on the physical evidence were inconsistent.

Scientific testing of the panties R.F. wore to the hospital tested negative for enzymes in saliva and semen but did reveal the presence of four sperm cells.[1] Yet, DNA testing of these panties revealed no DNA foreign to R.F.

Scientific testing of the panties R.F. wore to Day's house revealed sperm cells in a quantity less than the examiner would have expected. The examiner testified that a droplet of semen would contain thousands of sperm cells. And, the Commonwealth's DNA testing of these panties matched Day.

Pre-trial, Day had his own expert test the evidence. At trial, she testified she did not find sperm cells or Day's DNA on the items she tested. These were the same items tested by the Commonwealth's experts. She also testified DNA and sperm cells can be accidentally transferred easily. Sperm cells identified through microscopic evaluation can be misidentified. And, she testified it is possible evidence can be contaminated by coming into contact with other evidence and being handled improperly by third parties.

Day testified on his own behalf to the circumstances surrounding his move to West Virginia and asserted his innocence of the allegations.

Based on the evidence, the trial court instructed the jury on sodomy and sexual abuse. After deliberating close to four hours as to Day's guilt, the jury asked the trial court to tell them the penalty range for first-degree sexual abuse. The trial court, over Day's objection, told the jury the penalty was one to five years' imprisonment. Forthwith, the jury returned with a guilty verdict on sexual abuse.

Following the penalty phase, the jury recommended and the trial court imposed a three-year sentence.

Day appealed to the Court of Appeals who affirmed his conviction in an unpublished decision.

This Court granted Day's Motion for Discretionary Review.

### Analysis

#### I. The jury question

■ Day alleges the trial court erred by instructing the jury on the penalty range

---

1. The Commonwealth theorized Day pleasured himself and ejaculated while sodomizing R.F.

for a lesser included offense during the trial's guilt phase.

The trial court based its ruling on *Fugate v. Commonwealth,* 993 S.W.2d 931 (Ky.1999). In *Fugate,* this Court held a defendant is entitled to inform the jury during voir dire about the penalty range for the crimes with which he stands charged. In this case, the trial court opined that since the jury could have heard this penalty range information in voir dire, he could answer the jury's question in this case.

The Court of Appeals affirmed the trial court's ruling on this issue citing *Norton v. Commonwealth,* 37 S.W.3d 750 (Ky.2001). In *Norton,* this Court propounded the general rule that penalty evidence, such as the sentencing range for the instructed upon offenses, is not admissible during the guilt phase of a defendant's trial. However, the Court of Appeals denied Day relief based on the following language in *Norton,* "sentencing issues must not be raised prior to the penalty phase of trial as a means to impermissibly influence the jury to convict based on the desired penalty rather than on the elements of each given offense." *Norton* at 753. The Court of Appeals found no indication the trial court gave the penalty range information to the jury in order to impermissibly influence the jury to convict based on a desired verdict. In so holding, the Court of Appeals expanded our existing case law to create an exception where one has not been previously existed.

Based on our review of the law and the record, we are compelled to reverse Day's conviction and remand the case for further proceedings.

In *Commonwealth v. Philpott,* 75 S.W.3d 209, 213 (Ky.2002) we specifically held "in the trial of a 'felony case,' i.e., any trial in which a jury could return a verdict of guilty of a felony offense, the jury shall not be instructed on the penalty ranges of any offense, whether the primary or a lesser included offense." Despite this ruling, the trial court concluded, based on *Fugate,* that the jury would have been entitled to hear this information during voir dire; therefore, he could answer the jury's question. Aside from ignoring *Philpott,* this conclusion overlooks two crucial facts. First, in *Fugate,* the defendant wanted to voir dire the jury about the possible penalties. In this case, Day objected to the jury hearing the penalty range and the judge answering the question.

Second, the trial court's conclusion the jury would have heard the information anyway is belied by our holding in *Lawson v. Commonwealth,* 53 S.W.3d 534 (Ky. 2001). Under *Lawson,* defense counsel's voir dire on penalty range is limited to the range encompassed by the indicted offenses. In this case, the Grand Jury indicted Day for sodomy. The sexual abuse instruction arose as a result of the evidence presented at trial. Thus, the parties would have erred by informing potential jurors of the penalty range for sexual abuse during voir dire.

Before this Court, the Commonwealth cursorily argues the Court of Appeals reasonably interpreted *Norton.* However, the only contexts in which we have recognized any exceptions permitting penalty information during the guilt phase of trial occurred in voir dire and closing argument where the defendant had raised sentencing matters to which the Commonwealth needed to respond. *See Carver v. Commonwealth,* 303 S.W.3d 110 (Ky.2010) and *Norton.*

■ The crux of the Commonwealth's argument on this issue is that any error is harmless.

RCr 9.24 mandates that "no error or defect in any ruling ... or in anything done or omitted by the court ... is ground for granting a new trial or for setting aside a verdict ... unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." Further, RCr 9.24 provides we "must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."

■ Errors are either constitutional or non-constitutional depending on the source from which the defendant's right to preserve against the error arises. In this case, the right to prevent evidence of the sentencing range during a trial's guilt phase arises from KRS 532.055—the truth-in-sentencing statute. Since the right is statutory, it is non-constitutional.

■ A preserved, non-constitutional error is harmless "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." But "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

We cannot say the error in this case did not substantially influence the verdict. The jury deliberated for close to four hours before asking the trial court the penalty range question. Shortly after receiving an answer, the jury returned a guilty verdict on the lesser offense. Moreover, following penalty phase deliberations the jury returned a sentencing recommendation reflecting the mid-point of the available sentencing range.

Based on the foregoing, we are compelled to reverse Day's conviction and remand the case for further proceedings. As such, this Court shall only address other issues raised in this appeal that are capable of recurring on re-trial.

## II. Evidence of Flight

■ Day argues the trial court erred by allowing the Commonwealth to introduce Day's move to West Virginia as "flight evidence." Day contends the circumstances of his move did not clearly indicate a consciousness of guilt.

■■ A trial court's ruling on the admissibility of evidence will not be disturbed on appeal unless the trial court abused its discretion. The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

■ As a general rule, proof of flight to elude capture or prevent discovery is admissible because "flight is always some evidence of a sense of guilt." *Rodriguez v. Commonwealth*, 107 S.W.3d 215 (Ky.2003) *quoting Hord v. Commonwealth*, 227 Ky. 439, 13 S.W.2d 244, 246 (1928). The two primary Kentucky cases addressing flight are *Rodriguez v. Commonwealth, Id.* and *Jackson v. Commonwealth*, 199 S.W.3d 763 (Ky.App.2006).

In *Rodriguez, supra* the defendant fled the crime scene in a stolen car within minutes of the crime. In *Jackson, supra* the defendant fled the jurisdiction shortly after posting bond.

Day argues he met with the trooper three times during a one month period before he moved. There were no criminal charges pending against him when he moved. And, the trooper had not told him

to stay in Kentucky. Day claimed he moved to West Virginia to be close to friends. And, he did not make any attempt to conceal his whereabouts or identity from Kentucky law enforcement.

The Commonwealth argues Day knew about the allegations when he moved. He did not notify his employer, landlord, or the police before he moved. He left some of his possessions—including his truck behind. And, Day did not have a job when he moved to West Virginia.

The Court of Appeals concluded that although these facts presented a "close call" regarding Day's flight as consciousness of guilt, the trial court did not abuse its discretion in admitting the evidence. Moreover, Day had the opportunity to rebut the flight as consciousness of guilt inference at trial. Indeed, Day did testify as to the circumstances of his move.

We are inclined to agree with the lower courts and the Commonwealth. The trial court did not abuse its discretion by admitting this evidence and such evidence is admissible on re-trial.

### III. Violation of Discovery Orders and Improper Comments by the Commonwealth

Day takes issue with the Commonwealth's failure to provide a chain of custody for the underwear and jeans R.F. wore at the time of the incident that were collected from R.F. by her mother and stored in a paper bag for weeks prior to being given to the police. And, Day contends the Commonwealth's expert's notes from which the expert testified should have been excluded because the Commonwealth failed to turn them over to Day.

The Court of Appeals found no abuse of discretion by the trial court in admitting this evidence and neither do we. Despite delays in the discovery process which re-sulted in at least one continuance, Day was able to test the items with his own expert. Moreover, the significance of the results of scientific testing was subject to a battle of the experts with each party presenting evidence to support its own conclusion. As Day is now aware of all the evidence the Commonwealth will present upon re-trial, we find no merit to Day's argument the evidence must be excluded as a result of the discovery violations.

Lastly, Day takes issue with comments made by the Commonwealth during trial. The Court of Appeals found no merit on this issue. Since we have reversed Day's conviction on other grounds, we need not address this issue.

### Conclusion

Because the trial court erred by instructing the jury on the penalty phase for the lesser included offense during the trial's guilt phase, we reverse Day's conviction and remand the case to the circuit court for further proceedings.

All sitting. All concur.